**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Joel Schlosser and Renee Pundzak, | Case No. 2:25-cv-10641-RMG |
| Plaintiffs, | |
| v. | |
| State Farm Fire and Casualty Company, | **ORDER AND OPINION** |
| Defendant. | |

This matter is before the Court on Plaintiffs' Motion to Compel, (Dkt. No. 27), and Motion for Summary Judgment, (Dkt. No. 31). Defendant responded (Dkt. Nos. 29, 32). Plaintiffs filed a reply to Defendant's response on the Motion to Compel (Dkt. No. 30). This matter is now ripe for ruling.

## I.     Background

### A.  The Storm and the Policy

This case arises from an insurance claim for property damage caused by a storm. On June 10, 2024, a severe hail and windstorm struck the home of Plaintiffs Joel Schlosser and Renee Pundzak ("Property"). (Dkt. No. 1-1 at 6). As a result of the storm, Plaintiffs' home sustained damage to its roof, gutter, downspout, shed roof, vinyl siding, and fascia. (Dkt. Nos. 31-2, 31-3, 31-10). At the time of the storm, Plaintiffs' home was insured by Defendant, which had previously sold them an insurance policy designated as policy number 40-CN-Z268-0 ("Policy"). (Dkt. No. 1-1 at 6, Dkt. No. 31-1). Under the Policy, Defendant is obligated to pay for "accidental direct physical loss" to the Property unless a specific exclusion applies, such as if the loss is caused by wear, tear, decay, or deterioration. (Dkt. No. 31-1 at 8, 18). It further states that if there is accidental direct physical loss, State Farm will pay "the cost to repair or replace with similar construction and for the same use." (*Id.* at 21–22). Following the storm, Plaintiffs submitted a property insurance claim with Defendant for storm-related damage. (*Id.* at 5–9).

1

**B. Claim Estimates**

In the aftermath of the storm and Plaintiffs' claim, several estimates on the extent of the damage and repair costs were prepared.

On June 26, 2024, Defendant sent field adjuster Emory Brooks to inspect the Property. During his inspection, Brooks took pictures illustrating the Property's condition. (Dkt. Nos. 31-2, 31-3). These pictures showed that the home sustained damage to its vinyl siding and shingles on the rear and front of the roof. (Dkt. No. 31-2). In particular, the pictures show that most of the roof damage was on the front slope. (*Id.*).

On June 27, 2024, Brooks entered his inspection results into the claim file. He reported significant hail and siding damage on the left and front slopes of the dwelling. (Dkt. No. 31-3). His note further records "Labor Minimums: Yes – Repairs" and sets out his next steps as "Write estimate, settle and close." (*Id.*).

On June 28, 2024, Defendant published its initial estimate using Brooks' report. (Dkt. No. 31-4). The estimate included coverage for damage to the roof, gutter, downspout, shed roof, and fascia. The estimated did not think total roof replacement was needed. (*Id.*). Additionally, the estimate did not include coverage for vinyl siding or replacement scope on any elevation. (*Id.*). However, the estimate did include a siding labor minimum of $305.76. (*Id.* at 11). The estimate had a total replacement cost value of $9,184.49. (*Id.* at 6). Based on the estimate, Defendant issued an initial payment of $4,067.40 to Plaintiffs. (*Id.*). Plaintiffs challenged the initial estimate, claiming it was underinclusive.

On September 2, 2024, Defendant's claims handler Michael LaMotte reinspected the Property. (Dkt. No. 31-5). At the same time Defendant also used material availability services to evaluate whether the shingles and siding were unavailable. (Dkt. No. 31-4). On September 6, 2024,

Defendant received the results of the material availability services, indicating the siding was unavailable but that a similar shingle was available that could be trimmed to size so a reasonable repair could be completed. (*Id.*). Afterwards, on September 19, 2024, Mr. LaMotte issued a revised estimate. (Dkt. No. 31-5). The revised estimate included full vinyl siding replacement on all four elevations of the dwelling, with a total replacement cost value of $27,675.02. (*Id.* at 7). Afterwards, Defendant issued a payment of $22,553.41 to Plaintiffs. (*Id.*).

On October 4, 2024, Plaintiffs' public adjuster, Deanna Dolan wrote to Defendant challenging its position that the hail damaged roof could be repaired rather than replaced. (Dkt. No. 31-6). Her challenge was based on the International Residential Code ("IRC") Sections R904.1, R904.2, and R904.3, adopted within the South Carolina Residential Code ("SCRC"), which require roofing materials to be installed in accordance with the manufacturer's instructions and to be compatible with one another. (*Id.*).

Dolan's communication was accompanied by three relevant manufacturer documents. These documents indicated that the roof's existing shingles are discontinued and should not be mixed with new shingles. (*Id.*). These documents are: (1) an NTS Roofing Shingle Identification Report indicating that the existing roof shingles are the discontinued ELK Prestique I laminate shingles, that these shingles are not compatible with newer shingles, and a notation that "GAF does not allow mixing of current shingle products with this discontinued shingle product," (*Id.* at 7–8); (2) a GAF Technical Support letter dated May 6, 2021, stating that currently produced GAF shingles should not be mixed with legacy Elk shingles, (*Id.* at 9); and (3) a GAF-Elk bulletin dated November 1, 2007, titled "Do Not Mix Instructions," which states that the Prestique series shingles on Plaintiffs' roof should not be mixed "on any project." (*Id.* at 10). As a result, Dolan believed that total roof replacement was necessary. (*Id.*).

On November 12, 2024, Defendant's claims handler Shawnya Tulloch entered a claim note reflecting Defendant's response to Dolan's communication. (Dkt. No. 31-7). The note states that a "[total roof replacement is] not supported" and the manufacturer's instruction is a "document of preference that has no bearing on [Defendant's] decision." (*Id.*). It goes on to say Defendant's estimate "is written to replace front slope of the roof and decision will stand as [shingle locator service] team has found the roofing material is available to complete repair per [Defendant's Estimate]." (*Id.*).

On January 29, 2026, after this case was filed, Defendant retained Jorge O. Flores, Jr., to evaluate the repairability of the roof. (Dkt. No. 31-8). Flores reviewed documents and conducted a telephone interview with a GAF technical representative, but he did not conduct a physical inspection of the Property. On February 23, 2026, Flores issued his report concluding that isolated shingle repairs could be completed using shingles from a different manufacturer. (*Id.*). In making his findings, he relied on GAF technical advisory bulletin No. TAB-R-178 issued on April 11, 2025. (Dkt. No. 31-9). This bulletin states,"[n]ew shingles can be utilized to repair existing roofs as long as they match in dimensions and shingle exposure" and that it "supersedes any prior GAF Technical Advisory Bulletins on this topic." (*Id.*).

### C.  Procedural History

On June 25, 2025, Plaintiffs filed the instant action. Plaintiffs bring breach of contract and bad faith claims stemming from Defendant's handling of their insurance claim for property damage caused by the storm. (Dkt. No. 1-1 at 5–9). On August 13, 2025, Defendant removed the case to this Court on the basis of diversity jurisdiction and alleging that the amount in controversy exceeds $75,000.00. (Dkt. No. 1).

4

On April 30, 2026, Plaintiffs filed their Motion to Compel in which they ask the Court to order Defendant to produce its estimates in their native format with all the accompanying metadata. (Dkt. No. 27). Thereafter, Defendant responded arguing that the requested information was cumulative and disproportional to the needs of the case. (Dkt. No. 29).

On May 29, 2026, Plaintiffs filed their Motion for Summary Judgment arguing that the Policy, expert opinions, and SCRC show that total roof replacement is needed and Defendant's failure to pay for it is a breach of its contractual obligations and in bad faith. (Dkt. No. 31).

## II.    Legal Standard

### A.  Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgement as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 & n.4 (1986) (citing Rule 56(c)). The Court will interpret all inferences and ambiguities against the movant and in favor of the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Where the moving party has met its burden to put forth sufficient evidence to demonstrate there is no genuine dispute of material fact, the non-moving party must come forth with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Rule 56(e)). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

### B. Motion to Compel

Parties to civil litigation may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense" so long as the information is "proportional to the needs of the case . . ." Fed. R. Civ. P. 26(b)(1). The scope of discovery permitted by Rule 26 is designed to provide a party with information reasonably necessary to afford a fair opportunity to develop his or her case. *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 983 (4th Cir. 1992) (noting that "the discovery rules are given 'a broad and liberal treatment'"). "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by forbidding or limiting the scope of discovery. Fed. R. Civ. P. 26(c)(1). The court "must limit the frequency or extent of discovery . . . if it determines that the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). "The scope and conduct of discovery are within the sound discretion of the district court." *Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 568 n.16 (4th Cir. 1995); *see also Carefirst of Md, Inc. v. Carefirst Pregnancy Ctrs.*, 334 F.3d 390, 402 (4th Cir. 2003) ("Courts have broad discretion in [their] resolution of discovery problems arising in cases before [them].") (internal quotation marks omitted). To enforce the provisions of Rule 26, under Federal Rule of Civil Procedure 37, a "party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1).

## III. Discussion

### A. Plaintiffs' Motion for Summary Judgment

Plaintiffs argue that they are entitled to judgment on their breach of contract and bad faith claims stemming from Defendant's failure to replace their roof for two reasons: (1) the Policy and expert opinions demonstrate that total roof replacement is necessary, and (2) the SCRC and

manufacture document mandate total roof replacement. (Dkt. No. 31 at 6–17). In response, Defendant argues that Plaintiffs' positions are flawed because the Policy and expert opinions do not indicate that total roof replacement is needed merely if some covered damage exists. (Dkt. No. 32 at 5–8). Likewise, it also argues that Plaintiffs' code argument does not establish a breach and bad faith as a matter of law because Defendant believes it can repair damaged parts of the roof with similar shingles. (*Id.* at 7–9). For the reasons stated below, the Court denies Plaintiffs' Motion for Summary Judgment.

### i. Plaintiffs' Breach of Contract Claim

Plaintiffs argue that Defendant breached its contractual obligations because the language of the contract explicitly states, "[Defendant] will pay the cost to repair or replace with similar construction and for the same use on the premises . . ., the damaged part of the property covered [under the Policy]." (Dkt. No. 31 at 6–9). Plaintiffs submit Mr. Gannon's expert opinion that the damaged roof areas cannot be repaired to pre-loss condition without total roof replacement because the old shingles will crack, break, and lose functionality. (Dkt. No. 31-10 at 2–3). As such, Plaintiffs argue that, in light of the Policy and Mr. Gannon's opinion, Defendant breached its contractual obligations by not fully replacing Plaintiffs' roof. (Dkt. No. 31 at 6–9).

Plaintiffs also argue that pursuant to the Building Ordinance and Law ("BOL") coverage in the Policy, Defendant is required to pay the additional costs incurred to conduct the repair or replacement in conformance with the applicable building code. (*Id.* at 9–12). The BOL states "[Defendant] will pay for the increased cost to repair or rebuild the physically damaged portion of the building structure caused by the enforcement of a building, zoning, or land use ordinance or law." (Dkt. No. 31-1 at 39). Accordingly, Plaintiffs point to the SCRC, which requires that roofs be installed according to the manufacturer's instructions, and manufacturer documents, which

indicate that the roof's existing shingles are discontinued and should not be mixed with new shingles, as evidence that the total roof replacement is necessary under the BOL and Defendant's failure to do so is a breach of its duty under the Policy. (Dkt. No. 31 at 6–12).

In response to Plaintiffs' arguments, Defendant first argues that it is not obligated under the Policy to replace the whole roof merely because some of it is damaged. (Dkt. No. 32 at 5–8). To that extent, they argue that Mr. Flores' testimony and Joel Schlosser's testimony indicate that the damaged shingles can be replaced without replacing the whole roof. (*Id.* at 7–8). Defendant also argues the BOL applies only to increased costs caused by an enforcement action and that no enforcement action has been brought against Plaintiffs. (*Id.* at 8). Additionally, it argues that a genuine dispute exists as to whether shingles can be mixed. (*Id.* at 5–8). It points to GAF's technical advisory bulletin No. TAB-R-178, which states that new shingles can be used to repair existing roofs so long as they match dimension and exposure and that it supersedes GAF's prior advisory bulletins that Plaintiffs submitted. (*Id.*).

To properly allege a breach of contract, plaintiffs must allege 1) the existence of a contract, 2) the breach of the contract, and 3) the damages caused by the breach. *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962). "[I]nsurance policies are subject to general rules of contract construction, and therefore, we must enforce, not write contracts of insurance and . . . must give policy language its plain, ordinary and popular meaning." *Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399, 406 (S.C. 2014). "Ambiguous or conflicting terms in an insurance policy must be construed liberally in favor of the insured and strictly against the insurer." *Diamond State Ins. Co. v. Homestead Indus.*, 456 S.E.2d 912, 915 (S.C. 1995) (citation omitted). "It is a cardinal principle of insurance law in [South Carolina], requiring no citation of authority, that a policy or contract of insurance is to be considered liberally in favor of the insured, and strictly as against the company."

*McAllister v. Motor Ins. Co.*, 88 S.E.2d 621, 622 (S.C. 1955) (quoting *Haselden v. Standard Mut. Life Ass'n*, 1 S.E.2d 924, 926 (S.C. 1939)).

Plaintiffs are not entitled to judgment on their breach of contract claim because a genuine dispute exists as to whether Defendant is required to replace the whole roof.

First, the Court disagrees with Plaintiffs' broad interpretation of the Policy. The plain language of the Policy states that repair is only required over the damaged part. (Dkt. No. 31-1 at 21–22). The Policy therefore only applies to damaged areas, and Plaintiffs do not contend that the old shingles were damaged by the storm only that the storm-damaged shingles cannot be repaired without also replacing the old shingles. And while under South Carolina law, the Policy is construed liberally in favor of the insured against the insurer, this does not allow the Court to read in terms beyond the contract's plain meaning. *McAllister*, 88 S.E.2d at 622; *Bell*, 757 S.E.2d at 406.

The Court finds that there is a genuine dispute as to whether total roof replacement is required under the Policy. Despite Mr. Gannon's opinion that isolated repairs of the roof are impossible because of the old shingles, Mr. Flores contends that isolated repairs are possible without further damaging the old shingles. (Dkt. Nos. 31-7, 31-8, 31-10). Moreover, Joel Schlosser's testimony, that in February 2024 several shingles were repaired, indicates that it may be possible to repair the damaged parts without replacing the old shingles. (Dkt. No. 32-2 at 4–5). Additionally, the Brooks' and Gannon's reports show that most of the roof damage is on the front slope with some on the rear slope. (Dkt. Nos. 31-2, 31-10). Even though the reports indicate that over half of the roof was damaged, (1,517 of 2,991.23 square feet), it is unclear exactly how this is apportioned between the front and rear slope. (Dkt. Nos. 31-2, 31-4, 31-10). Indeed, the damaged part of the roof could be either only the damaged shingles or the whole roof (or anything in between), depending on whether

9

merely replacing the individual damaged shingles satisfactorily repairs the damage sustained by the storm. *See Rumbley v. State Farm Fire & Cas. Co.*, No. 3:21-CV-209-KHJ-MTP, 2022 WL 1278091, at *3 (S.D. Miss. Apr. 28, 2022) (denying summary judgment on a breach of contract claim because there was a genuine issue of whether the insurer was required to replace only the shingles at issue or the whole roof); *Sherman Creek Condominiums Inc. v. Mid-Century Ins. Co.*, No. 19-CV-1735-BHL, 2022 WL 4366636, at *3 (E.D. Wis. Sept. 21, 2022) (finding a genuine dispute of fact when the plaintiff contended "spot repairs [were] not feasible because such repairs would damage the surrounding shingles, leading to 'a never-ending repair'" but the defendant contended spot repairs were possible). This determination depends on facts, not contract interpretation. As such, the Court finds that Plaintiffs' Motion does not establish as a matter of law that Defendant has this duty or breached it because there is a genuine dispute as to whether Defendant must provide coverage for total roof repair.

Second, Plaintiffs have not shown as a matter of law that the SCRC and manufacturer instructions require Defendant to fully replace the roof. Considering the GAF TAB-R-178 issued on April 11, 2025, the Court finds that there is a genuine dispute as to whether the roof can be repaired using newer shingles. Given that a reasonable jury could disagree on both whether the roof can be repaired with new shingles and the damaged portion, Defendant has shown a genuine issue exists as to Defendant's inadequate performance. *See Collins v. Allstate Ins. Co.*, No. CIV.A.2:09CV01824WY, 2009 WL 4729901, at *5–6 (E.D. Pa. Dec. 10, 2009) (finding a genuine issue exists where affidavit supports that repairing only damaged portions of the roof would result in a different roof appearance and would not place the plaintiff back into the position they were in before the loss). Thus, Plaintiffs fail to show that they are entitled to judgment on their breach of contract claim.

### ii. Plaintiffs' Bad Faith Claim

Plaintiffs argue that they are entitled to judgment on their bad faith claim because Defendant mishandled their claim. (Dkt. No. 31 at 12–17). Plaintiffs argue that Defendant's failure to initially include coverage for the side vinyl repair was unreasonable given the evidence before it at the time. (*Id.* at 12–15). Plaintiffs also argue that Defendant's failure to pay for total roof replacement was unreasonable because of the SCRC, the manufacturer instructions, and the BOL all require total roof replacement. (*Id.* at 15–17). In response, Defendant contends that since its revised estimate included coverage for the side vinyl there cannot be bad faith. (Dkt. No. 32 at 9–10). It also argues that its decision not to pay for total roof replacement is not unreasonable because it believes that the damaged shingles can be repaired without requiring total roof replacement. (*Id.* at 11–12).

In South Carolina, if "an insured can demonstrate bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance contract, he can recover consequential damages in a tort action." *Tadlock Painting Co. v. Maryland Cas. Co.*, 473 S.E.2d 52, 53 (S.C. 1996) (quoting *Nichols v. State Farm Mut. Auto. Ins. Co.*, 306 S.E.2d 616, 619 (S.C. 1983)). Bad faith can occur even without breach of any provision of an insurance contract. *Id.* at 55 ("[T]he benefits due to an insured are not limited solely by those expressly set out in the contract."). For a bad faith claim to be successful, the plaintiff bears the burden of showing: (1) the existence of an insurance contract between the parties; (2) refusal by the insurer to pay benefits due under the contract; (3) that the refusal resulted from the insurer's bad faith or unreasonable action; and (4) that the refusal caused damage to the insured. *Howard v. State Farm Mut. Auto. Ins.*, 450 S.E.2d 582, 586 (S.C. 1994).

11

Plaintiffs have not shown that they are entitled to judgment on their bad faith claim because there is a genuine dispute as to whether Defendant had a reasonable basis for its position.

First, the Court rejects Plaintiffs' argument that Defendant's omission of siding repair for the vinyl in the June 28, 2024, estimate is bad faith. Failure to pay cannot form the basis of a bad faith claim where there was no refusal to pay by the insurer. *Snyder v. Auto-Owners Ins. Co.*, 634 F.Supp.3d 252, 259 (D.S.C. 2022) (citing *Carolina Auto Remarketing Servs., LLC. v. Universal Underwriters Ins. Co.*, No. 2:17-cv-858-BHH, 2020 WL 5534285, at *7 (D.S.C. Sept. 15, 2020) ("[Plaintiff's] bad faith cause of action fails automatically because there was no refusal to pay benefits due under the contract.")). Defendant did not refuse to pay the claim because it included coverage for the side vinyl in its revised estimate. *Id.* at 259–63 (rejecting a bad faith theory when the insurer's initial valuation differed from the insureds' estimate, because when the insurer was "presented with a new estimate," it "made adjustments to its position" and paid in accordance with that revised figure meaning that the insurer never refused to pay benefits due). As such, the Court finds that Plaintiffs have not shown as a matter of law that Defendant's failure to include coverage for the side vinyl in its initial estimate is bad faith.

Second, the Court rejects Plaintiffs' argument that Defendant's refusal to replace the whole roof is unreasonable and in bad faith. For the reasons discussed above with respect to Plaintiffs' breach of contract claim, Plaintiffs fail to show that Defendant did not have a reasonable basis for declining coverage for total roof replacement because there is a genuine dispute as to material fact as to whether Defendant was required to replace the roof. Defendant had an arguable basis to decline coverage for total roof replacement since whether the roof could be repaired with available newer shingles is disputed. And even though Defendant did not have GAF TAB-R-178 showing that new and old shingles could be mixed at the time it made its estimate, the Court finds that

Defendant has shown that at the time it made its decision whether the roof could be repaired with available similar shingles is genuinely debatable. Thus, Plaintiffs fail to show that they are entitled to judgment on their bad faith claim.

### iii.  Plaintiffs' Punitive Damages Request

Plaintiffs claim that "Defendant's actions were undeniably willful and in reckless disregard of the Plaintiffs' rights" and as such they are entitled to punitive damages. (Dkt. No. 31 at 18). For the reasons discussed above, Plaintiffs have not shown at this stage that they are entitled punitive damages, and their request is denied.

### B.  Plaintiffs' Motion to Compel

Plaintiffs argue that they are entitled to Defendant's estimates in their native Xactimate format with the metadata because the June 28, 2024, estimate omits any scope of repair for the vinyl siding, which they argue contradicts the claim note documenting the damage and inclusion of siding labor minimum in the estimate. (Dkt. No. 27 at 3–5). They further argue that since the estimate's repair line items are out of sequence and incomplete, this demonstrates that parts of the estimate were selectively removed prior to issuance. (*Id.*). Accordingly, they request the estimates in their native format and with the metadata because they believe it will show if portions of the estimate were deleted in bad faith. (*Id.*). Defendant responds by arguing that it has already produced the requested information in multiple reasonable usable forms and as such Plaintiffs' request is cumulative and too late. (Dkt. No. 29 at 5–7). It further argues that Plaintiffs' request is not proportional to the needs of the case. (*Id.* at 7–9).

Since the motion deals with Electronically Stored Information ("ESI"), the Court looks to Federal Rule of Civil Procedure 34, which governs with ESI production. Under that rule, a requesting party may request that the responding party produce ESI in a particular form. Fed. R.

Civ. P. 34(b)(1)(c). If "the responding party objects to a requested form—or if no form was specified in the request—the party must state the form or forms it intends to use." *Id.* 34(b)(2)(D). The Rule also provides that "[a] party must produce documents as they are kept in the usual course of business . . . in a reasonably usable form" and that "[a] party need not produce the same . . . information in more than one form." *Id.* 34(b)(2)(E).

Plaintiffs are not entitled to the native format and metadata of the estimates because it is cumulative. Defendant already produced this information in the Xactimate Estimate Audit Report, Estimate Variation Report, Estimate Ownership Audit, and Estimate Changes Report. (Dkt. No. 29 at 2–3, 5–7). These documents detail the changes between estimates' versions, the user information, and the history of the estimates. (*Id.*). The Court therefore finds that Defendant already produced the requested information in multiple reasonable usable forms. In light of this fact, compelling Defendant to produce the native format and metadata would be disproportionate to the needs of the case. Moreover, compelling Defendant to produce this information would not be in the spirit of Rule 34 because this information is not stored in the ordinary course of business and would require Defendant to reach out to its vendor. *Id.* 34(b)(2)(E)(i) ("A party must produce documents as they are kept in the usual course of business . . . ."). Thus, the Court will deny Plaintiffs' Motion to Compel.

## IV.     Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment. (Dkt. No. 31) and Motion to Compel (Dkt. No. 27).

**AND IT IS SO ORDERED**.

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

14

July 13, 2026
Charleston, South Carolina